# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF MICHIGAN

## SOUTHERN DIVISION

SARAH KREBS,

                    Plaintiff,                   Case No. 2:25-cv-13238

                                     Hon.

v.

MICHIGAN STATE POLICE,
COLONEL JAMES GRADY,
in his Individual and professional capacity,

Defendants.

_____

MICHAEL D. WEAVER (P43985)
TODD F. FLOOD (P58555)
FLOOD LAW, PLLC
*Attorneys for Plaintiff*
155 W. Congress St., Ste. 350
Detroit, MI 48226
PH: (248) 547-1032
FX: (248) 547-0140
Mweaver@floodlaw.com
tflood@floodlaw.com

_____

There is no civil action between these parties arising out of the same
transaction or occurrence as alleged in this Complaint pending in this Court,
nor has any such action been previously filed and dismissed or transferred
after having been assigned to a judge.

## **COMPLAINT**

1

**NOW COMES** SARAH KREBS, by and through counsel, FLOOD LAW, PLLC for her Complaint against Defendants, MICHIGAN STATE POLICE, and COLONEL JAMES GRADY, states as follows:

## INTRODUCTION

This is a case in which Plaintiff, Sarah Krebs, had to endure systemic racism, sexism, and harassment over her 25-year career at the Michigan State Police. Ms. Krebs had an accolade-filled career, but instead of being able to look back proudly upon her accomplishments, her time with the MSP ended with unnecessary stress, harassment, and ridicule due to the incompetence and self-prioritizing nature of the appointed leadership. MSP frequently prioritized advancing DEI initiatives without regard for the qualifications of those who were applying, thereby hurting the agency and decimating the morale of agents and troopers. Furthermore, Ms. Krebs faced a significant amount of retaliation after a sexual harassment claim was filed on her behalf, creating lifelong mental trauma. This set the precedent that others will be retaliated against for coming forward with serious harassment allegations, thus perpetuating a cycle of inequity and injustice.

## PARTIES, JURISDICTION, AND VENUE

1.      This is an action for violation of Title VII, the Eliot-Larsen Civil Rights Act, Title VII, and Intentional Infliction of Emotional Distress as the result of promotional race discrimination and retaliation.

2

2.    Plaintiff invokes the jurisdiction of this Court pursuant to 28 U.S.C. § 1331.

3.    The EEOC issued Plaintiff a right to sue letter on July 17, 2025.

4.    At all times relevant hereto, Plaintiff SARAH KREBS was and is a resident of Commerce Township, County of Oakland, State of Michigan.

5.    At all times relevant hereto, Defendant JAMES GRADY was and is an employee of the MICHIGAN STATE POLICE, headquartered in Dimondale, County of Eaton, State of Michigan.

6.    At all times relevant hereto, Defendant MICHIGAN STATE POLICE (hereinafter referred to as "MSP") was and is an agency headquartered in Dimondale, County of Eaton, State of Michigan.

7.    This action alleges that MSP employee, Defendant JAMES GRADY instigated and maintained a pattern of workplace harassment that permeated throughout the agency and regularly impacted the agency's decision-making processes.

8.    This Court has subject matter jurisdiction pursuant 28 U.S.C. § 1331 because this case arises under federal law.

## GENERAL ALLEGATIONS

9. Plaintiff hereby realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

## CONCERNS BEGIN UNDER COL. GASPER

10. Plaintiff enlisted in the MSP in September of 2000. Her career spanned three uniform post assignments and seven different departmental divisions, serving as a specialist on the forensic art unit and a subject matter expert in missing persons, human remains, and human trafficking investigations.  She served at every rank from trooper to inspector and officially retired in September of 2025, after serving 25 years.

11. On December 15, 2022, Plaintiff was one of two candidates interviewed for the position of Chief Diversity, Equity, and Inclusion ("DEI") Officer. She was interviewed by Maj. Beth Clark, Dr. Juli Liebler and Stephanie Horton, who was the hiring manager. The other candidate was a Black male from outside the agency, who Plaintiff later found out was the preferred candidate of Col. Gasper due to his race, not his qualifications.

12. HR Director Stephanie Horton refused to hire the other candidate on the basis of race, as it was unethical and illegal, and threatened to resign or be fired as HR Director if she was forced to do so.

13. On December 25, 2022, Plaintiff was promoted to the rank of Inspector as Commander of Recruiting and Selection and the Chief DEI Officer of the MSP, with Ms. Horton being her supervisor. This was a longer-than-usual delay in informing the selected candidate that they had received the position.

14. During the nine months that Plaintiff held the position of Chief DEI Officer under Col. Gasper, the Director of MSP, he did not make any effort to communicate or collaborate with Plaintiff on DEI matters.

15. On October 8, 2023, Plaintiff was the hiring manager for Recruiting and Selection's First Lieutenant position, which had been vacated by a transfer. She was urged by Ms. Horton to include a leadership team member on the hiring panel in order to prevent any manipulation of the hiring process, and it was suggested she appoint Maj. Chris Hawkins. The panel unanimously hired Lt. Brian Buege over Lt. Tedric Gibbs, a Black male. This promotion was apparently controversial to Col. Gasper, who then "reamed" Maj. Hawkins for not choosing Lt. Gibbs. This was the second incident where Plaintiff became aware of the hiring bias that had been created in order to push forward the Colonel's desire to hire on the basis of race.

16. During the spring and summer of 2023, Plaintiff and her Recruiting and Selection Section (RSS) and HR employees were preparing for an upcoming recruit school that started in July of that year. Dr. Liebler was a newer addition to their RSS meetings and suggested prioritizing background investigations for minority applicants during one of the meetings. Plaintiff and Ms. Horton made sure to establish that they had to maintain legal decision-making in the hiring process and disputed this suggestion. Dr. Liebler, presumably encouraged by Col. Gasper, always emphasized the importance of "diversity

numbers" in recruit schools, as well as the desire to have 20% "diversity" quota in the upcoming Trooper Recruit School (TRS). Diversity only applied to race and gender by Dr. Liebler when it was discussed.

17. Later, in August of 2023, Col. Gasper unexpectedly and abruptly announced his retirement.

## RELATIONSHIP WITH DEFENDANT GRADY BEGINS TO CRACK

18. In October of 2023, Plaintiff volunteered to serve as an assessor for the Illinois State Police Merit Board's 2023 Captain and Lieutenant Assessments held in Springfield, Illinois.

19. On her drive home from the assessments, Plaintiff contacted Defendant James Grady, who was a captain at the MSP Training Division at the time, to tell him about the assessment process and how she thought it could help do away with the amount of bias that the MSP selection process was plagued with. Defendant Grady and Plaintiff had had prior conversations about the department's biased promotional processes and on this instance, Defendant Grady initiated a conversation on how he planned to utilize Plaintiff's position as DEI Officer more progressively and efficiently than it had been before. As part of this desire, he mentioned that he would like the Chief DEI Officer to be present at leadership meetings. At the time of this conversation, it was well known that Defendant Grady was in the selection process to be the next MSP Colonel. He was then promoted later that month to the position.

20. The next month, Beyonka Swain-Mills, a civilian Human Resources Developer 11 that Col. Gasper had acting out of class in the position as a 15 in the Director's Office, told Dr. Liebler that Plaintiff and F/Lt. Buege were suing her, which was blatantly untrue. An "11" is an entry level position, whereas reaching a 15 or 16 can span an entire course of a 20+ year career. Plaintiff was forced to dispel a rumor of this magnitude to a newly appointed Leadership Team Member, causing much distress. This was the first of many incidents that demonstrated distrust between the Director's Office and members of HR, including Plaintiff, especially with Ms. Swain-Mills at the helm sowing those issues.

## **BIASED HIRING PRACTICES NEGATIVELY AFFECT PLAINTIFF**

21. Plaintiff interviewed for Training Division Captain on December 18, 2023, in front of a panel made up of Defendant Grady, Major Beth Clark, and LTC Mike Krumm. There were an estimated seven candidates: Plaintiff, Inspector Frank Keck, Inspector Lisa Rish, Inspector John Bowen, F/Lt. Rusty Ernstes, Captain Darren Green, and F/Lt. Tim Olson.

22. Olson was chosen as the selected candidate, which was a surprising choice, as he "double jumped" from the rank of First Lieutenant of Recruit Training to the Captain of the Training Division. This was the second time that Olson had double jumped a ranking, as he had gone from Sergeant to First Lieutenant while in the training division.

23. However, this was not surprising to others in the agency—in October of 2023, Defendant Grady had stated to Major Pennell that he would be "hand picking" every captain position. After these interviews, Defendant Grady verified with LTC Krumm that F/Lt. Olson was not the top candidate, **but he "did not care,"** and that he needed F/Lt. Olson in that spot to ensure the "correct" 15 was chosen for the spot that Olson was vacating. Maj. Pennell commented about Lt Tedric Gibbs being the "correct" 15, which was confirmed by Grady.

24. Capt. Darren Green had attempted to laterally move into this position, and Col. Grady denied that move. Upon information and belief, Defendant Grady told Capt. Green that Green "wouldn't even be a Captain if [he] had a say in it." Plaintiff was also informed that LTC Aimee Brimacombe had the lateral-transfer policy changed and told an HR manager this was to block Darren Green's move.

25. **Plaintiff was later told that her interview was the best, and that she was the candidate selected by the hiring manager, LTC Michael Krumm, and panel member Major Beth Clark on December 18. However, Defendant Grady argued with LTC Krumm, and then overruled the rest of the panel in order to appoint F/Lt. Olson.** Defendant Grady told Maj. Clark and LTC Krumm "Tim is the one I put in charge when I leave," and repeatedly stated that "Tim deserves this." LTC Krumm pushed back, pointing out that Plaintiff

was the better candidate, resulting in Defendant Grady instigating a heated argument, which included yelling and almost came to blows, over the topic.

26. Defendant Grady told them during this exchange that his reasoning for selecting Tim Olson was that he wants the "right 15" put in Cpt. Olson's place when he leaves, implying that he would prefer to have Tedric Gibbs in that position.

27. Plaintiff being promoted from her position as a SAM 16 would not vacate a position that Lt. Gibbs, who was a 14 at the time, would be able to promote to, thus making it an undesirable move for Defendant Grady's motives.

28. Maj. Clark told Plaintiff that Tim's interview was not broad and only focused on training. On the other hand, Maj. Clark and LTC Krumm were impressed with how Plaintiff had worked in various roles, including multiple divisions, both uniform and non-uniform, and her interview covered a broad range of topics, included a 30/60/90 plan for the Captain position, and provided handouts like a printed vision plan.

29. Plaintiff met with LTC Krumm after not being selected for the Captain position, and he said that Plaintiff "did great" and that he did not have any critiques from Plaintiff's interview. He could not elaborate on why Plaintiff was not selected.

30. Three days later, a re-organization memo was posted to the agency stating that the Recruiting and Selection Section had been moved out from under

Plaintiff and given to the Training Division. Plaintiff's staff of 27 people were transferred out, leaving her by herself in the role of Chief DEI Officer with no support staff. This was done with **no warning** and was not communicated to Plaintiff until the memo was posted.

31. Essentially, Plaintiff interviewed for the role that she already held when she interviewed for Captain of the Training Division on December 18, 2023. It is clear that Defendant Grady knew this was coming before he held the Training Division Captain interviews and intended to take the role away from Plaintiff.

32. Conveniently, Captain Olson's hiring vacated his First Lieutenant spot, which Defendant Grady immediately turned over to Tedric Gibbs, promoting him to F/Lt. by using the hiring panel of the newly-promoted Captain Olson, Dr. Julie Liebler, and Ms. Swain-Mills. This was unsurprising after Defendant Grady made his desire to promote him clear during the December 18th interviews.

## PLAINTIFF EXCLUDED FROM OPPORTUNITIES SHE ORIGINATED

33. In January of 2024, Plaintiff met with LTC Brimacombe and Defendant Grady to discuss the MSP's "DEI Vision," in which Plaintiff presented them with a DEI Strategic Plan and steps to remove racial and sexual bias within the Grooming Standards and Selection Processes within the MSP. For example, there were Official Orders that barred enlisted employees from wearing "puffy hair," a thinly-veiled racial bias, and banned enlisted women

10

from wearing colored nail polish. Plaintiff believed these orders to be outdated, as well as racially and gender-restrictive. Additionally, Plaintiff was interested in making more of the requirements gender-neutral, such as removing the requirement for male candidates to shave their heads while in recruit school, which was also a violation of the Crown Act. However, Defendant Grady stated that he was "not ready" to make any changes to these orders to remove the bias.

34. After not making much progress with Defendant Grady, Plaintiff attempted another route with Capt. Olson, the new Training Division Commander, to comply with the Crown Act and end the practice of requiring recruits to shave their heads. Although the MSP Recruit School handbook does not specifically tell recruits they need to shave their heads, telling recruits to keep their hair as "short as possible" on their first visit to recruit school "for sanitary reasons" defies the Crown Act and is obviously degrading to the women recruits who have always been allowed to keep their head unshaved.  This is in addition to a member of the training staff telling the recruits that their heads should look like his, bald, during an Appearance and Grooming standards speech. Despite Plaintiff's complaints about the discriminatory nature of these practices, changes were not made to the training process and the discrimination continued, demonstrating that maintaining the threatening culture overrides policy and statutes.

35. On February 6, 2024, Plaintiff reminded Defendant Grady of her desire to overhaul the MSP selection process. She asked to put together a steering committee composed of the different bureaus to come up with a new, less biased way of hiring and promoting within the agency. Defendant Grady agreed that this was a good idea but told her to "hold off" on creating the steering committee.

36. However, in June of 2025, Defendant Grady later put Beyonka Swain-Mills in charge of the project without informing Plaintiff that he was moving forward with her idea. Ms. Swain-Mills created the steering committee but did not ask Plaintiff to be part of it.

37. Plaintiff was made aware of this through a memorandum that Defendant Grady issued titled "Fairness, Accountability, and Impartial Recruitment Workgroup" ("FAIR Workgroup"), which was disseminated via Official Correspondence. The memorandum stated that a member of the FAIR Workgroup would be present during promotional and selection interviews for the stated purpose of collecting research regarding the existing process. Ms. Swain-Mills was the designated point of contact for the FAIR Workgroup.

38. Not only did Ms. Swain-Mills only have about two years at the MSP, Plaintiff was also on her hiring panel when she came into the agency, and knew that she was hired in as an HR Developer analyst-11, without the ability to qualify her to be a 12 when previous Col. Gasper asked to promote her into his office.

In her short tenure with the agency and under the Grady administration, she was promoted to a SAM 16 in the director's office by the panel of Defendant Grady, Dr. Liebler, and LTC Brimacombe. She was given a take-home car with her promotion, which was at an enormously expedited pace, raising eyebrows within the agency.

39. Subsequently, Plaintiff learned from an HR Manager that, a week or two prior to the issuance of this memorandum, the manager had been contacted and asked to meet with a yet-unnamed promotional work group because Defendant Grady wanted the workgroup to start "immediately". After this memo was published, there was an abundance of questions to the HR Staff regarding this workgroup. A second meeting was conducted on June 16th, 2025, and according to this HR employee, no parameters had been established regarding the composition of the workgroup panel, the criteria for member selection, or the scope of observations to be conducted. Furthermore, the employee indicated that the only individuals to be informed of the purported "results" of the interviews were F/Lt. Tedric Gibbs and Dr. Christine Kwiatkowski.

40. As of this date, there have been no changes to the selection process. This was extremely disappointing to Plaintiff, who had measures prepared to initiate change and was then excluded from involvement in order for Defendant Grady to include his confidants.

## HOSTILE MEETING WITH DEFENDANT GRADY

41. On June 25, 2024, Plaintiff had a scheduled one-on-one meeting with Defendant Grady labeled as a "Culture of the Agency" meeting, at which Defendant Grady insisted Ms. Swain-Mills be allowed to attend. This was the third such meeting that had been held that focused on the culture and morale of the agency. All meetings prior to this meeting had been in Defendant Grady's office. However, Defendant Grady informed Plaintiff via his administrative assistant that he will need to meet on Microsoft Teams that day, which was odd given that all three parties were present at the MSP headquarters. When the virtual meeting began, Defendant Grady kept his camera off, which was out of character and disconcerting, as this was a recurring meeting of familiar parties.

42. This meeting was adversarial from the beginning. Plaintiff attempted to resolve an issue regarding the vacant Recruiting and Selection Section (RSS) First Lieutenant position that had been left open for several months. Plaintiff had been the direct supervisor of that position in the past and knew there was a significant amount of work to be done, especially as there was no assistant commander to maintain the workload in the meantime. Defendant Grady did not take this simple question well, and began to speak in a raised, sharp voice while practically spitting at Plaintiff through the screen. He told Plaintiff that "Troopers don't need to know why I'm not filling spots," to which Plaintiff

was taken aback by, as it was extremely rude, degrading, and baffling—there was no reason that Defendant Grady would not simply give a reason for the delay in promoting the position. Plaintiff then pointed out that she is not just a trooper, but rather the MSP Chief DEI Officer, to which Defendant Grady then snapped back with "You don't need to know why I'm filling or not filling spots." It was apparent that Defendant Grady was maintaining a hostile attitude towards Plaintiff, creating an atmosphere of intimidation and disrespect.

43. Plaintiff was under the impression that Ms. Swain-Mills had already advised Defendant Grady what Plaintiff wanted to discuss, as they had prepared the agenda together. Instead of fostering dialogue on the topic, Defendant Grady escalated tension and was prepared to fight with her prior to her even entering the virtual meeting room, thus leaving Plaintiff to feel attacked, demeaned, and unsafe in expressing her concerns about biased selection processes.

44. Although feeling this way, Plaintiff pressed the issue, as it was fostering a culture of distrust within the ranks. She told Defendant Grady that it appeared as though he was holding positions open for specific candidates that he was planning to place his personal choices in the positions. Plaintiff also stated that those actions were an unfair hiring practice and opened the MSP up to legal liability. Plaintiff felt that other candidates that were ready for the promotion at that time should be allowed to interview, and Defendant Grady

was treating these candidates unfairly. Defendant Grady responded in an extremely defensive and adversarial tone, stating "no one needs to know what I am planning; other Colonels have done the same in the past." He then independently brought up the open CVED Captain spot, which at that time had not been filled for almost 8 months, by mockingly stating "I haven't filled the CVED position either, and no one needs to know why I'm not filling that position too… It's up to me when I fill or don't fill spots."

45. At this point, Plaintiff felt like this hostile and alarming conversation was spiraling. Plaintiff reiterated that she believed Defendant Grady should not interfere in anything related to the civil service processes and let the selections play out. Plaintiff stated that she would not support Defendant Grady if he was trying to manipulate the civil service processes to diversify the agency, as that would be unfair and potentially illegal. Because Defendant Grady seemed to desire diversifying the agency, Plaintiff offered to work with him to root out the issue at the source of the problem—the relationship bias that exists in the selection processes, a problem that cannot be fixed overnight. This topic was discussed by Plaintiff and Defendant Grady at length prior to the meeting, before and after Grady was promoted to Colonel.

46. At that point, Defendant Grady refused to respond or engage with Plaintiff, so Plaintiff stated that they were going to have to agree to disagree and they ended the call. Ms. Swain-Mills was quiet the entire time but later told

Plaintiff that she "didn't read the room," which was difficult given that Defendant Grady wouldn't turn his camera on.

47. At 1:47 pm that day, all of Plaintiff's future scheduled one-on-one meetings with Defendant Grady were cancelled by Defendant Grady's administrative assistant, Heather Luebs, through December. The Colonel did not meet with her again and did not speak to her personally until January 2025, when Plaintiff was directed to hold a meeting with Defendant Grady by Poppy Hernandez as the result of the political downfall of DEI.

48. On July 16, 2024, Plaintiff met with Capt. Ken Dilg to discuss her involuntary movement from HR to the Professional Development Bureau (PDB). This movement was confusing, as the Chief DEI Officer or Employment Equity Officer (EEO) had always been part of the HR team. Defendant Grady stated that Capt. Dilg would be her daily supervisor, but the organizational chart actually showed that she would be reporting to Dr. Liebler. Capt. Dilg mentioned that he had met with Defendant Grady about this change, and Defendant Grady said he wanted Plaintiff to be in more of an educational role, and added that she "has good ideas, but no follow through."

49. This statement is a gross mischaracterization of Plaintiff, who had told Defendant once prior that her strengths lay in ideation, but she needed staff for follow through for the complex and extensive detail they required. Defendant had clearly used that conversation against her. Capt. Dilg and

Plaintiff then had a discussion surrounding her lack of possibility for career progression due to the move out of HR, her lack of staff to support the Defendant's vision, and the "follow through," including the outline for a Diversity Video Series that Defendant Grady had asked for.

50. Later that day, LTC Krumm held a bureau-wide meeting at the Training Academy where a new org chart was shown on the overhead screen. This chart showed Plaintiff on the same line as the section commanders with her new "section:" the Cultural Enrichment & Education Section. This reorganization put her on the same level as the F/Lt's ("15s") that run their sections, even though she technically outranks them at the rank of Inspector, or a "SAM16." Further, the Organizational Development Division (ODD) was given the Recruiting and Selection section, which has been moved back to HQ and out of the training unit, but is not given to Plaintiff, even though she was the previous commander of that unit.

51. The next day, Plaintiff saw LTC Krumm and expressed her concerns about the move, which was effectively a demotion. LTC Krumm responded that he would address this change with HR.

52. On July 19, 2024, Dr. Liebler emailed Plaintiff that she will be reporting to Defendant Grady. Dr. Liebler then advised her that she had to revise her Position Description, and requested that Plaintiff remove all references to recruiting and selection, as well as any mention of being part of the HR

leadership team. Doing so took away any decision-making authority Plaintiff had, reverting her role to an educational role only. Verbally, Dr. Liebler told Plaintiff she was still carrying out her HR duties as the Chief DEI Officer.

53. On July 20, 2024, LTC Krumm sent out an email to PDB leadership, stating "we have also been advised that Insp. Krebs will likely need to remain a dotted line to the director's office on the org chart but will work through Dr. Liebler instead of ODD. This is for various reasons but the main one being if her position remained in ODD it would have negatively impacted the 15's in ODD. We are working through these issues."

## HOSTILE MEETING WITH POPPY HERNANDEZ

54. On August 8, 2024, Plaintiff hosted an EIO meeting at MSPHQ with several other state agency DEI Officers.  Gov. Whitmer's Chief DEI Officer, Poppy Hernandez, arrived first and was alone with Plaintiff in a meeting room. Ms. Hernandez asked about MSP membership's thoughts on Defendant Grady's leadership. Choosing her words carefully, as she knew Ms. Hernandez reports directly to the governor, Plaintiff says that their membership is "divided" on Defendant Grady. When asked why, Plaintiff states that it is currently due to the "Kentwood incident" which is Sgt. Brian Keely's charges for second-degree murder after hitting a fleeing felon with his truck.

55. Ms. Hernandez then asked Plaintiff what her relationship with Defendant Grady is like, to which Plaintiff responded that they used to have a good

relationship, but it had been strained recently due to their disagreeing on Defendant Grady's involvement in selection processes and the likelihood of legal action arising as a result. When Plaintiff mentioned that Defendant Grady had cancelled their one-on-ones, Ms. Hernandez got visibly frustrated and said she needed to "get those back," and went on to state that Defendant Grady is entitled to manipulate the internal selection process "because relationships are important."

56. Plaintiff reiterated that she supports DEI efforts, but only through legal channels—not ones where people are discriminating against one group for another. Ms. Hernandez then pointed her finger in Plaintiff's face, stating that "you know the Governor put him there to do just that.  He was appointed to his position to diversify the agency.  He has been given those exact directions," implying that it was acceptable and encouraged for Defendant Grady to hire based on those he had close relationships with instead of those who were qualified.

57. This was seen firsthand on August 14, 2024, when Plaintiff received an email from the PRIDE Employee Resource Group (ERG) referencing their concern that F/Lt. Keyonn Whitfield, who has had complaints filed against him for homophobia, is being considered for an open Captain position. Dr. Liebler told Plaintiff that she talked to Defendant Grady about this issue, and Defendant Grady, who is close friends with F/Lt. Whitfield, said he believes

that F/Lt. Whitfield has grown considerably since the complaints and is not

concerned about the appointment.

58. Unsurprisingly, F/Lt. Whitfield was promoted to Captain of the Commercial

Vehicle Enforcement Division (CVED) by the panel of Defendant Grady, LTC

David Sosinski, and LTC Brimacombe.

**PLAINTIFF EXPERIENCES RETALIATORY DEMOTION**

59. On August 15, 2024, Plaintiff received an email from an HR employee

referencing her movement out of the HR Division and into the PDB, stating

that she was initially thought to have to report to Defendant Grady, but "he

did not seem receptive to this." Therefore, she was to report to Dr. Liebler in

a section that Defendant Grady was now referring to as "Cultural

Enrichment and Education (CEE)."

60. LTC Krumm told Plaintiff on August 26, 2024, that she will finally be

allocated a staff and can move forward with two new hires, as they now have

space at HQ for them. Later that week, LTC Krumm added that Plaintiff

needed to move out of her office in HR and go to the 2nd floor to use her new

desk space, a cubicle on the same floor as budget. This cubicle offered no

privacy. **This was a harsh downgrade from her current office on the**

**third floor at MSPHQ. Plaintiff did not know of any enlisted members**

**at the rank of Inspector that were working out of cubicles in the**

**building, let alone in the entire agency—even unranked 14s out of HQ**

**are given private offices, demonstrating how this was yet another adverse employment action taken against Plaintiff.** Plaintiff expressed her concerns with this due to the confidential nature of many of her conversations with employees about sexual harassment and discrimination, and civil rights investigations to Dr. Liebler. This was an obvious retaliatory measure to move Plaintiff to an obscure location within the building where there was no privacy.

61. On September 9, 2024, while out to dinner after hours at a conference, Plaintiff received a call from Maj. Hawkins about a post she made on the Michigan Chiefs of Police (MACP) forum. The MACP forum is a closed discussion board made up of members of the MACP. Plaintiff had responded to a question a local chief had asked about marijuana law, and credited Maj. Hawkins, as he was the one who gave her the information. She had communicated via email with Maj. Hawkins on the specific marijuana law, and told him that she was planning on giving him credit for his answer on the forum.

62. On the phone, Maj. Hawkins seemed extremely concerned, asking Plaintiff what forum she had used his name on. When Plaintiff rehashed their earlier conversation about her giving him credit on the MACP forum, Maj. Hawkins, who sounded distressed, asked her to take it down as soon as

possible, as LTC Brimacombe was upset about it and needed it to be taken down.

63. Minutes later, Dr. Liebler called Plaintiff with the same request. Dr. Liebler also seemed extraordinarily stressed, telling her that it was imperative that she took it down as soon as possible and that she would receive an email that would give her more context and what exactly to add to the post, as LTC Brimacombe felt it was factually wrong and MSP should not be posting legal advice. Plaintiff left dinner to delete the post. She then received a forwarded email chain where LTC Brimacombe accused Plaintiff, in an email with Plaintiff's entire chain of command, of not asking Maj. Hawkins permission to use his name and misunderstanding the law.

64. This situation was stressful for Plaintiff, who was confused as to why LTC Brimacombe hadn't texted or called her directly, as she had done many times before, and felt as if she was being accused of misconduct. **Plaintiff began to understand that her refusal to stand by and watch as employee's equal employment opportunity laws were being violated, her position being moved out of HR, her office being moved to a cubicle, and the hypersensitivity about her forum post was due to targeted retaliation by leadership. This was, yet again, evidence of adverse employment actions being taken against Plaintiff.**

65. Later, on September 17, 2024, Captain Dilg asked Plaintiff to send an email defending her need for an actual office space.

66. On September 26, 2024, during a meeting with LTC Krumm, Plaintiff was told that her social media usage was being monitored and told her that she needed to "watch what you do online." Plaintiff was confused by this, and asked for clarification. LTC Krumm claimed he wasn't sure why he had been asked to talk to her about her social media, but believed it to be related to an incident where she had shared a news article about a CVED Officer that had been hit and killed, and then changed her profile photo to the MCO shield with a mourning badge, as many other MSP members had. When asking for further clarification as to why this was being flagged, LTC Krumm told Plaintiff to "just be careful" in an accusatory tone. This situation was frustrating for Plaintiff, who was beginning to feel as if she was under a microscope, and that every action, on or off-duty, was being scrutinized and exaggerated. This began a state of hypervigilance for Plaintiff that did not relinquish.

67. On October 7, 2024, Maj. Hawkins called Plaintiff to tell her that Defendant Grady was upset that the CEE Section, which at that time was just Plaintiff with no support staff, had not produced or posted anything on social media for Hispanic Heritage Month. This was the first month that Plaintiff had started the Diversity Video Series that was requested by Defendant Grady,

and she had filmed and released a video on Diwali. The State of Michigan Equity and Inclusion Officer's (EIOs) statewide team had produced a Hispanic Heritage Month virtual event that Plaintiff had shared with their communication department for the MSP Newsletter/Colonel's Corner and other distribution. Again, Plaintiff felt Defendant Grady was hostile for not generating something he deemed important without communicating with her, even though he had received the Diversity Video Series events on July 16th through Cpt. Dilg. She never received any follow-up.

68. On October 18, 2024, the new HR director Jon Meyer removed Plaintiff from the Microsoft Teams HR Chat. This removal came as a surprise, as Plaintiff still worked closely on a daily basis with Labor Relations and Disability Management sections in HR. Later, the HR Division Secretary, Michelle Hackard, asked Plaintiff if she wanted to be removed, to which she responded no, and Michelle added her back in.

69. Several weeks later, Lisa Gee-Cram sent a message to the chat thanking Plaintiff for her work with HR, but she was being removed again. This isolated Plaintiff from a work group that she knew she was going to continue to work with, and made her feel like she no longer was trusted in that group.

70. On November 14, 2024, Plaintiff and Defendant Grady are asked to film a video together at an event for the Xavier DeGroat Autism Foundation. When waiting for the cameraman, Plaintiff and Defendant Grady are left alone in a

room together, she attempted to communicate with him. However, Defendant Grady completely ignored her, scrolled on his phone, and did not answer a single question directly posed to him, creating an unprofessional and uncomfortable situation and confirming that he had a grudge against her.

71. On January 6, 2025, Plaintiff worked with HR to have a job posted for a Sergeant position to oversee her newly-created Cultural Enrichment and Education Section. On the last day of the job posting, the MSP Financial Director, Amanda Baker, pulled it, citing "budgeting concerns." This elimination of the Sergeant position means that Plaintiff is now a first-line supervisor for two proposed civilian positions. At this point, Erika McDowell had already been hired into the section, and Plaintiff requested that Hazel Moyo **also** be hired into the empty CEE Section's tech position.

72. On January 27, 2024, Dr. Liebler sent an email to Plaintiff confirming that Defendant Grady approved the Hazel Moyo hire instead of a Sergeant hire, knowing full well that this organizational choice is what meant Plaintiff now had to engage as the first-line supervisor of these two newly-hired civilian employees. Hazel Moyo's position was initiated and solely hired over a sergeant position that was crucial to the unit, marking yet another time Defendant Grady prioritized hiring that achieved his diversity goals rather than the efficiency of the department.

73. These choices were **yet another demotion of Plaintiff's duties,** as she was now an Inspector supervising civilian analysts, which is what her job description was when she was a Sergeant 12 in the Missing Persons Unit.

74. This retaliation was also seen in Plaintiff's pay—2024 was the first time she qualified for Pay for Performance and received 4%. Plaintiff was rated as high performing in her 2023 Performance Appraisal, which would have been within the rating period. In 2025, with no changes to her work ethic and still with a glowing performance appraisal, Plaintiff received 2.5% in her pay for performance, which was a significant downgrade without any apparent reasoning.

75. On June 25, 2025, a Memorandum on the Pay for Performance was changed to discontinue keeping record of reasoning for employee's awards, raising suspicion about how these bonuses were determined.

### TARGETED REMOVAL OF NECESSARY SOFTWARE ACCESS

76. On March 3, 2025, Plaintiff returned to duty after taking FMLA stress leave. She attempted to access IA Pro, the department's software for Internal Affairs reporting, to follow up on a Civil Rights investigation, and found that her access had been removed.

77. When Plaintiff questioned why she was not longer able to have full IA Pro Access, LTC Brimacombe responded that the restriction should have been "expected" with her temporary reassignment, and that going forward, the

27

information she requests shall be provided to her by the Professional
Standards Section.

78. Plaintiff pushed back on this via email, and a virtual Teams meeting was
scheduled with LTC Brimacombe as a result. During this meeting, LTC
Brimacombe advises Plaintiff that her audit trails in IA have been under
review, and, "in full transparency," this was the reason for her access
removal. The case that LTC Brimacombe used as an example was a case
where the witness of the investigation had an open EEOC investigation with
the agency, making it directly relevant to Plaintiff's position to ensure that
there would be no overlap, so she attempted to explain this and maintain that
her access to IA Pro was crucial.

79. LTC Brimacombe then cautioned Plaintiff, stating "it's important that
you're careful in who you confide in. Because there is a feeling that you are
talking about stuff with other people that is making them feel uncomfortable,
like actions the department is taking against you."

80. A few weeks later, Capt. Matt Williams says Plaintiff can have her IA Pro
access back, but advises Plaintiff that she will need to keep a log of her
entries into cases, and has to acknowledge a directive. This was the first time
that Plaintiff had ever been instructed to do so, confirming for her that she
was being monitored by her supervisors even though she had been cleared of
any wrongdoing.

81. The March 20, 2025 directive given as a result advised Plaintiff that she had to remain confidential, not discuss active or ongoing internal affairs investigations, only access records that she has a legitimate, department-related need for and all access into cases must be documented.

82. The directive ended with "Improper or undocumented access of records will be treated as a violation of Official Order 02-01 and investigated through a professional standards investigation. Discipline, up to and including termination, may result in a violation of this order.

83. This odd retaliation continued when Plaintiff was "inadvertently" left off the calendar appointment for the Spring Director's Meeting at MSPHQ on April 22, 2025. This meeting was attended by **every Captain and Inspector** in the state.

## SEXISM AT MSP

### *Objectification*

84. On July 10, 2024, Insp. Lisa Gee-Cram contacted Plaintiff on direction from Dr. Liebler to inform her that she was directed to investigate a rumor that a female sergeant may have been a witness to sexual harassment by Training Division staff against a female recruit. In this alleged incident, male Training Staff members were viewing a female recruit's social media to assess her attractiveness (or unattractiveness), calling her a "catfish," and discussing her waist size to body shame her. They then began to shout out the recruit's name

while playing a sexually-charged drinking game called "how many beers." Because Plaintiff had a personal relationship with the female sergeant, she was asked to call her to seek out more information. The female sergeant confirmed the details of the incident, and informed Plaintiff that a trooper, hereinafter referred to as D.C., had been involved in the harassment. Plaintiff then advised Insp. Gee-Cram of the conversation, which she asserted that this needed to be a "Blue Team," which is a complaint against a member. Plaintiff volunteered to fill out the Blue Team form, as she had most of the information at that time, and then was not involved in any of the investigation afterwards.

85. On October 2, 2024, Plaintiff was informed that D.C.'s sexual harassment case was closed as unfounded. Plaintiff was surprised that she didn't get the closing memorandum on the Internal Affairs case, as she was the one who filled out the Blue Team Report, and standard procedure would be to send an update to the individual who filled it out. After reviewing the Internal Affairs investigatory report, Plaintiff was bewildered as to why it was determined to be unfounded, as the facts above were **confirmed** within a witness investigation.

86. Plaintiff reached out to F/Lt. Bock, who was the IA commander at that time, in an attempt to gain more context on the closing status. F/Lt. Bock informed her that there was nothing in the investigation that proved that D.C. had made the sexually charged statements about the female recruit. In fact, the

investigation did not even identify who had made the statements, whose Facebook account was used to access the recruit's social media information, or whose device it had been accessed on. Plaintiff pointed out that there were interviews in the IA investigation that proved that the party had taken place, that those sexually harassing statements were made, but not one of the multiple members in the room (which included a lieutenant) would say who made those statements or whose phone it was. F/Lt. Bock agreed that there was proof, but stated that there simply was not "mechanism" to address this issue, thereby rendering them unable to sustain the charge against D.C.

87. Plaintiff then contacted Capt. Deasy, who was the IA Captain at the time, and Insp. Matt Williams to express her concern. She also contacted LTC Brimacombe to discuss the issue. She met with LTC Brimacombe and Dr. Liebler to make verbal recommendations to pass along to the rest of the leadership team. Plaintiff's goal was to advocate for the whistleblower (the female sergeant that witnessed this behavior) in the case, as well as the innocent recruit who was subjected to unwelcome sexual harassment. The Training Staff had engaged in demeaning and derogatory conversations in which created a hostile and humiliated atmosphere as discussed by the female sergeant. The training staff's actions were not only offensive and inappropriate, but also discriminatory in nature, constituting gender based harassment in violation of the recruit's civil rights. The culture of harassment

needed to be addressed. Unfortunately, no one contacted by Plaintiff felt that this rose to the level of sexual harassment, and it fell on deaf ears.

88. Eventually, the Labor Relations Section of HR published the "Employee Relations" memo, which shared information about the incident to all MSP employees, outing both the female sergeant and the female recruit involved. The female sergeant was humiliated after that, and told Plaintiff that she was now receiving cold-shoulder treatment from the male training division staff. Plaintiff and Capt. Dilg attempted to convince the whistleblower to move positions so she no longer had to handle the unnecessary harassment.

89. This is **not the first time** that the Employee Relations memo outed victims of sexual harassment—**in fact, this is a regular occurrence when the victim is female.** This is extremely daunting, as many women in a male-dominated field find themselves with targets on their backs when they report sexual harassment and assault.

90. Plaintiff was contacted on November 22, 2024 by LTC Krumm to inform her that the incident is "dead." Plaintiff asked Dr. Liebler about this two days later, and Dr. Liebler expresses that she is also unhappy with how the situation was handled. Plaintiff expressed her concern that this could open up a lawsuit, and Dr. Liebler tells her to send an email between the both of them explaining their position in order to avoid litigation, as both of them did not agree with the outcome.

### *Sexual Harassment and Retaliation*

91. On December 9, 2024, Plaintiff went to the Perspective's Meeting Leadership Conference at the Renaissance Center in Detroit. After attending dinner at Andiamo's with several colleagues, Plaintiff went to the lobby bar at the Renaissance Center, where she was sexually harassed by a male lieutenant, hereby referred to as T.W., who forcibly kissed her in front of other agency members.

92. Plaintiff confronted T.W. the next morning at the conference about the inappropriateness of his actions and was taken aback by his hostile response. Instead of apologizing, he doubled down on the situation, arguing with Plaintiff and claiming that the scenario could be chalked up to their being friends.

93. On December 11, 2024, Plaintiff called T.W. and had an hour-long conversation with him about the situation, as the argument from the day before had left her agitated. By the end of the conversation, Plaintiff felt as though they had reached a mutual understanding, as they both were open and honest with each other throughout the conversation.

94. On December 17, 2024, Plaintiff was asked by Ms. Swain-Mills if T.W. had kissed her. Plaintiff has no idea how this became public knowledge, and when she inquired, Ms. Swain-Mills said that Defendant Grady had told her.

95. After Christmas break, on January 8, 2025, Plaintiff got a text from F/Lt. Nicole Bock on her work phone that says "we should talk." This immediately struck Plaintiff as an urgent matter, so she walked down to F/Lt. Bock's office in headquarters to see what the issue was. F/Lt. Bock advises Plaintiff that **LTC Krumm filed an IA report on her behalf** for the incident involving T.W. at the Leadership Forum last December. This investigation was unexpected, and Plaintiff felt extremely emotional and blindsided, but went through with the interview on the spot to address it immediately.

96. Later that month, Plaintiff was home sick when she received a message from LTC Krumm, asking her to join a Microsoft Teams meeting. This was a strange occurrence, as he knew that Plaintiff was off sick. When Plaintiff joined, she was informed that she was under investigation for "something" stemming from the sexual harassment investigation, which came as a complete shock. When asked for more context, LTC Krumm said that there are "allegations" against her, and that she can't talk to any other witnesses, including Plaintiff's husband, who is also in the MSP. Plaintiff, stunned, was overcome with emotion, and surprised that LTC Krumm was willing to bring this to her about this without having any answers to any of her questions, including what the allegations were.

97. LTC Krumm then told Plaintiff that she was being reassigned from her position as the DEI officer. This was **unprecedented—it was the first that**

**Plaintiff had ever heard of a command officer being removed from their post as the result of uninvestigated allegations,** especially for one resulting from a clear retaliatory complaint over a month after the initial investigation was held. LTC Krumm told her that the investigation will apparently be "wrapped up" within two weeks, per LTC Brimacombe.

98. LTC Krumm then informed Plaintiff that, on a so-called unrelated note, she needed to turn in her take-home vehicle by the end of the week. When asked if there would be another vehicle assigned to her, LTC Krumm responded that she would only be able to check out a pool car from HQ, **as per LTC Brimacombe**.

99. When asked for more information about this, Plaintiff was informed that many others in the department would eventually have to return their vehicles—**however, other employees were given until August 1 to do so, not "at the end of the week" on January 28.**

100. LTC Krumm then sent her an email containing a chain that hadn't been deleted. In the chain, there was a conversation between Insp. Gee-Cram and LTC Brimacombe discussing the reassignment of Plaintiff that confirmed that through LTC Brimacombe that Defendant Grady advised that he wanted her working three days in the Professional Development Bureau Office in person, which is above the required amount for State of Michigan members working

for MSP HQ, which was two days a week. Defendant Grady also said "if" she has enough work, she is permitted to work from home two days a week.

101.    Plaintiff immediately emailed LTC Krumm to confirm and summarize the main points of the meeting, including the fact that she **still does not know what the allegations are** and that the IA report that **he filed on her behalf without informing her** had evolved into this situation. She later received the email with her 48-hour notice with the date and time of the interview.

102.    On January 28, 2025, Plaintiff went to a pre-scheduled doctor's appointment with her general practitioner. During this appointment, her doctor made the decision that she needed to go on FMLA for stress. Plaintiff elected, per her doctor's recommendation, to start FMLA the next Monday so that she would be able to speak the truth during her IA interview scheduled for that Friday.

103.    Plaintiff is interviewed as a Principle on January 31, 2025 for the retaliatory statements made against her by a male employee after she was interviewed about being sexually harassed by him. During this interview, Plaintiff was questioned about an unrelated sexual harassment incident that was perpetrated against her years prior in which she was groped. Plaintiff later found out that this was to become a separate internal investigation, making it the third that month that she would be subjected to. Digging up past incidents was **extremely traumatic** for Plaintiff, who was not expecting to have to

relive old sexual harassment memories. To make matters worse, she was later told that there was insufficient evidence to sustain a claim for that incident, so that trauma was forced back upon her for no reason.

104.     As a result of these investigations, Plaintiff began trauma therapy on February 9, 2025.

105.     Plaintiff didn't hear back on the investigations until over two weeks later, when she finds out that all of the cases have been closed. The unwanted kissing complaint was closed as "unfounded." The retaliatory complaint naming Plaintiff as the Principle was closed as "unfounded." The unwanted touching complaint from four years prior was "not sustained for insufficient evidence." In the closing memorandum of the unwanted kissing complaint against T.W., it stated that Plaintiff filed this complaint herself, which is **untrue—it was filed by LTC Krumm on her behalf without alerting her.** Plaintiff requested a correction be made.

106.     On March 3, 2025, Plaintiff returned to duty after taking FMLA stress leave as the result of these incidents.

107.     **These investigations and their contrarious outcomes** caused Plaintiff severe distress, anxiety, and emotional suffering, as she received an **unfounded retaliatory complaint** against her after a report was filed against the initial perpetrator, **unbeknownst to her**. This creates a **harmful precedent that will have lasting consequences for Plaintiff and her mental**

**health.** This approach not only undermines the validity of Plaintiff's experience with sexual harassment, but also exacerbates the power imbalance present in these situations—when a woman's complaint is dismissed based on a retaliatory response, it signals that her allegations may be disregarded or invalidated when faced with opposition, creating a discouraging environment for other potential complainants.

108.    These mental health struggles are compounded on the fact that Plaintiff had also been reassigned from her position, resulting in further stress and anxiety. In both situations, Plaintiff was silenced and retaliated against for attempting to change the toxic culture that had been created within MSP, and then again as the result of a sexual harassment incident that was reported **without her knowledge, and then turned into a convoluted investigation.** This allows the perpetual cycle of inequity and injustice to continue at MSP, **especially against the women who attempt to bring change forth.**

<u>COUNT I</u>
<u>RETALIATION / RETALIATORY HARASSMENT</u>
<u>IN VIOLATION OF TITLE VII</u>

109.    Plaintiff hereby realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

110.    At all pertinent times, Plaintiff was an employee of MSP.

111.    After Plaintiff expressed concerns about being sued due to potentially unlawful promotional procedures, including Defendant Grady hiring **on the**

**basis of race**, Plaintiff was subjected to retaliation and retaliatory harassment including, but not limited to:

    a. Demotions without justification;

    b. Not receiving promotions she had earned due to the exact hiring practices she had raised concerns about;

    c. Public demoralization in front of other agency members; and

    d. Ostracization by Defendants, as described above in General Allegations, because she expressed concerns of harassment and discrimination in violation of Title VII.

112.    This retaliation and retaliatory harassment occurred, in part, because Plaintiff engaged in protected activity pursuant to Title VII. MSP's conduct, by and through its employees, agents and representatives, violated Title VII.

113.    As a direct and proximate result of MSP's wrongful acts and omissions, by and through its employee, agents and representatives, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits; and has suffered mental anguish, physical and emotional distress, humiliation and embarrassment.

**COUNT II**
**HOSTILE ENVIRONMENT AND HARASSMENT**
**IN VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT**

114.    Plaintiff hereby realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

115.    During the course of her employment with the Michigan State Police, Plaintiff was subjected to harassment and intimidation by Defendants, as described above in General Allegations.

116.    This unwelcome conduct subjected Plaintiff to harassment by way of retaliation by Defendants, as described above in General Allegations.

117.    Some of these incidents included, but are not limited to:

a.  Demoting her position and removing her support staff after she expressed to Defendant Grady a desire to abide by legal promotion procedures;

b.  Removing her one-on-one meetings after she expressed concern over the same;

c.  A retaliatory complaint being filed against her after a sexual harassment complaint was filed on her behalf without her knowledge;

d.  Being isolated and removed from various teams she was supposed to work closely with, including the leadership and HR teams;

e.  Being told she had to move her office to a cubicle on another floor, even when her rank afforded her an office space and her job required confidentiality;

f.  Having her access to vital software revoked;

g.  Not receiving the same bonus in 2024 as she had in 2023, even with identical reviews;

h.  Being told she needed to report to work an additional day a week more than other MSP employees; and

i.  Being told she had to return her take-home car 9 months earlier than everyone else.

118.  This behavior had the had the purpose and/or effect of substantially interfering with Plaintiff's employment and/or creating an intimidating, hostile, and offensive employment environment.

119.  MSP had both actual and constructive notice that its employee, Defendant Grady, and Plaintiff's director, created a hostile and offensive work environment for Plaintiff and others. This was explicitly expressed in conversations with Maj. Hawkins, Cpt. Dilg, Dr. Liebler, Capt. Williams, and LTC Krumm after Defendant's hostile and retaliatory acts.

120.  Despite having notice of the manipulation, intimidation, and hostile work environment, MSP continued to behave irrationally and offensively.

121.  Defendant's conduct violated the Elliot-Larson Civil Rights Act.

122.   As a direct and proximate result of Defendants' wrongful acts and omissions, by and through its employees, agents and representatives, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits; and has suffered mental anguish, physical and emotional distress, humiliation and embarrassment.

**COUNT III**

## **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

123.    Plaintiff hereby realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

124.    Defendants engaged in extreme and outrageous conduct through the following actions, including and not limited to:

    a.  Promoting less qualified individuals over Plaintiff after it was decided that she would be receiving the promotions;

    b.  Removing her access to vital computer programs she needed to do her job;

    c.  Removing her from the office space afforded to those of the same rank;

    d.  Encouraging the filing of a fabricated retaliatory sexual harassment complaint after a complaint was filed on Plaintiff's behalf after *she* experienced sexual harassment;

    e.   Forcing her to return her take-home car 9 months earlier than other agency members; and

    f.  Deliberately creating situations where Plaintiff was forced to do "damage control" for acts that were orchestrated to make her look irresponsible.

125.    Defendants acted intentionally when they committed these outrageous acts.

126.     Defendants intentionally caused Plaintiff severe emotional distress by enabling emotional hostility and retaliation throughout her career whenever she attempted to resolve miscommunications or deliberate manipulation of her work environment.

127.     As direct and proximate result of Defendants' intentional infliction of emotional distress, Plaintiff experienced significant mental anguish and distress, was denied the benefits of the career advancement at MSP, experienced pain and suffering, emotional distress, an onslaught of depression and anxiety due to said distress, and emotional regression.

128.     As a result, Plaintiff has suffered injuries including and not limited to those detailed in the above complaint.

**WHEREFORE**, Plaintiff SARAH KREBS prays that this Honorable Court grant the following remedies:

A. Declare that the aforementioned practices and actions of Defendants constitute unlawful employment practices in violation of the Title VII of the Civil Rights Act of 1964, as amended, 42 USC §2000e et seq., the Elliott-Larsen Civil Rights Act, MCL § 37.2101 et seq., and Michigan Common Law.

B. Award Plaintiff all lost wages and the value of fringe benefits, past and future, to which she is entitled;

C.  Award Plaintiff compensatory damages;

D.  Award Plaintiff punitive damages;

E.  Award Plaintiff exemplary damages;

F.  Award Plaintiff reasonable attorney's fees, costs, and interest; and

G.  Award Plaintiff such other relief as this Court deems just and proper.

## **CONCLUSION**

WHEREFORE, based on the foregoing allegations, Plaintiff SARAH KREBS, requests this Honorable Court to enter a judgment in her favor against Defendants MICHIGAN STATE POLICE and COL. JAMES GRADY in whatever amount to which they are found to be entitled together with exemplary damages, costs, interest, and attorney's fees.

Respectfully submitted,

**FLOOD LAW, PLLC**

/s/ Michael D. Weaver
**MICHAEL D. WEAVER (P43985)**
**TODD F. FLOOD (P58555)**
*Attorneys for Plaintiff*
155 W. Congress St., Ste.350
Detroit, MI 48226
PH: (248) 547-1032
FX: (248) 547-0140
Mweaver@floodlaw.com
Tflood@floodlaw.com

Dated: October 14, 2025

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff, SARAH KREBS, Individually, by and through counsel, FLOOD

LAW, PLLC, hereby demands a trial by jury in the above-captioned matter.

Respectfully submitted,

**FLOOD LAW, PLLC**

<u>/s/ Michael D. Weaver</u>
**MICHAEL D. WEAVER (P43985)**
**TODD F. FLOOD (P58555)**
*Attorneys for Plaintiff*
155 W. Congress St., Ste.350
Detroit, MI 48226
PH: (248) 547-1032
FX: (248) 547-0140
Mweaver@floodlaw.com
Tflood@floodlaw.com

Dated: October 14, 2025